**Affirmed and Majority and Dissenting Opinions filed April 16, 2020.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-18-00406-CR

**ERNESTO VILLARREAL, JR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 400th District Court
Fort Bend County, Texas
Trial Court Cause No. 15-DCR-069295**

## MAJORITY OPINION

Appellant consented to a search of his truck during a traffic stop, and officers found more than ninety-five pounds of cocaine in a hidden compartment. After the trial court denied appellant's motion to suppress, he pleaded guilty to possession of a controlled substance. In two issues, appellant challenges the trial court's denial of the motion to suppress, arguing that a police officer lacked reasonable suspicion for the initial stop and subsequent detention. We affirm.

## I.    LEGAL PRINCIPLES AND STANDARD OF REVIEW

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018).  A seizure must be justified at its inception and reasonably related in scope to the circumstances that justified the seizure in the first place.  *Id.* A police officer is justified in stopping a vehicle if the officer has reasonable suspicion to believe that a traffic violation has occurred.  *Id.*  A traffic stop made for the purpose of investigating a traffic violation must be reasonably related to that purpose and may not be prolonged beyond the time to complete the tasks associated with the traffic stop.  *Id.*

During a traffic stop, an officer may request the driver's license, vehicle registration, and proof of insurance, and the officer may run a computer check on that information.  *Id.* An officer may ask the driver about matters unrelated to the purpose of the stop so long as the questioning does not measurably extend the duration of the stop.  *Id.*; *see also Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015).

An officer's authority for the stop ends when tasks related to the traffic infraction are, or reasonably should be, completed.  *Rodriguez*, 575 U.S. at 354; *see also Lerma*, 543 S.W.3d at 191.  However, if an officer develops reasonable suspicion that an occupant of a vehicle is involved in criminal activity, the officer may continue questioning the person regardless of whether the tasks related to the traffic stop have come to an end.  *See Lerma*, 543 S.W.3d at 191; *see also Rodriguez*, 575 U.S. at 355.

Reasonable suspicion exists if an officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that a particular person is, has been, or soon will be engaged

in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). This standard is objective; so, courts applying it are to disregard the subjective intent of the officer. *Id.* The officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain the suspect. *Leming v. State*, 493 S.W.3d 552, 562 (Tex. Crim. App. 2016). The possibility of an innocent explanation, rather than criminal activity, for the officer's observations does not deprive the officer of a reasonable suspicion of criminal activity. *Id.* at 565. Indeed, the principal function of a traffic stop based on reasonable suspicion is to "resolve that very ambiguity and establish whether the activity is in fact legal or illegal." *Id.* (quoting *Woods v. State*, 956 S.W.2d 33, 37 (Tex. Crim. App. 1997)).

If a defendant shows that a search or seizure occurred without a warrant, then the burden shifts to the State to prove that the search or seizure was conducted pursuant to a warrant or otherwise was reasonable. *Ford*, 158 S.W.3d at 492. When reviewing a trial court's ruling on a motion to suppress, we give almost complete deference to the trial court in determining historical facts. *Lerma*, 543 S.W.3d at 190. We review de novo whether the facts are sufficient to give rise to reasonable suspicion. *Id.*

## II. REASONABLE SUSPICION FOR THE STOP

In his first issue, appellant contends that the officer lacked reasonable suspicion to stop appellant's truck for the traffic violation of operating a motor vehicle that has not been registered. *See* Tex. Transp. Code § 502.472. Appellant contends that the stop was illegal because "the record was not fully developed to justify a traffic stop from a [computer database] 'no record' return on appellant's registration."

3

## A.     Evidence About the Stop

At the hearing on the motion to suppress, the State stipulated that the seizure and search in this case were made without warrants. The officer who stopped appellant was the only testifying witness.  The officer testified that he entered the license plate number of the truck that appellant was driving into the patrol car's computer to check various databases for information about, among other things, the truck's registration and insurance status.  These databases include the Texas Crime Information Center (TCIC), the National Crime Information Center (NCIC), and the Texas Law Enforcement Telecommunications System (TLETS).

On this occasion, the databases returned "no record" for the truck's registration status.  Based on this information, the officer believed that the truck was not registered.  The officer initiated the traffic stop solely based on the "no record" return.

The officer testified that the databases are managed by the Texas Department of Public Safety.  He has used the databases every day for every traffic stop he has made, and he has made many traffic stops.  He has found the databases to be reliable.  In his experience, on "very few" occasions the databases would show that a vehicle was unregistered when the vehicle actually was registered. The officer was not sure what "technicality" would cause such a situation.  He acknowledged that it could be caused by the vehicle having been registered "fairly soon," but he was "not sure what the lag time is."[1]

The trial court filed written findings. The court found, among other things, that the officer "provided credible and truthful testimony."

---

[1] Appellant adduced evidence that the traffic stop occurred on a Sunday, and the truck had been registered on the prior Friday.

**B.    Analysis of the Stop**

Generally, an officer may use information obtained from checking a vehicle's license plate in a computer database to form reasonable suspicion. *See Delk v. State*, 855 S.W.2d 700, 709–10, 712 (Tex. Crim. App. 1993) (officers had reasonable suspicion to question the defendant after an officer "ran a license check on a vehicle" in a law enforcement database, and the computer indicated that the car had been stolen and the owner was a homicide victim); *see also United States v. Broca-Martinez*, 855 F.3d 675, 679–80 (5th Cir. 2017) (reviewing state and federal decisions; concluding that a "state computer database indication of insurance status may establish reasonable suspicion"); *United States v. Esquivel-Rios*, 725 F.3d 1231, 1235 (10th Cir. 2013) (noting that courts "have regularly upheld traffic stops based on information that the defendant's vehicle's registration failed to appear in a law enforcement database"). Even a seemingly inconclusive report, such as "unconfirmed" insurance status, may be a specific and articulable fact that supports a traffic stop if the officer is familiar with the database and the system is reliable. *Broca-Martinez*, 855 F.3d at 677, 680 (reasonable suspicion based on the NCIC and TCIC databases showing "unconfirmed" insurance; officer testified that "[f]or the most part," the databases were accurate and that "unconfirmed" meant the vehicle wasn't insured).

Appellant relies on two related cases from the Seventh Court of Appeals concerning the stop of a driver and passenger when the stop was based on a database return of "unavailable" or "undocumented" proof of insurance. *See Contraras v. State*, 309 S.W.3d 168, 172 (Tex. App.—Amarillo 2010, pet. ref'd); *Gonzalez-Gilando v. State*, 306 S.W.3d 893, 895 (Tex. App.—Amarillo 2010, pet.

5

ref'd).[2]  In the context of those cases, the words were not self-explanatory, and the record gave no explanation for their meaning.  *Contraras*, 309 S.W.3d at 172–73.  The court reasoned that the information obtained by the officers was "hardly suggestive of anything other than the unknown."  *Gonzalez-Gilando*, 306 S.W.3d at 896.  Although an officer "unilaterally opined" that the information in the database led him to believe that the vehicle did not have insurance, the court could not accept the officer's inference as reasonable absent some other evidence to show: the source of the information, an explanation of the term "unavailable" in this context, an explanation of the timeliness of the information in the database, an explanation of how often users of the database were told that insurance information was unavailable, evidence that the database was operating at the time, or some similar contextual evidence.  *See id.* at 896–97.  According to the court of appeals, when there is a return of "unavailable" or "undocumented," there must be some other evidence to show a foundation for the officer's conclusion that the driver did not have insurance.  *Contraras*, 309 S.W.3d at 173.  The court reversed the trial court's denials of the motions to suppress.

The Fourth Court of Appeals similarly affirmed the suppression of evidence when the sole basis for the stop was information from the Financial Responsibility Verification Program (FRVP), which the court described as a "computer-based vehicle check," showing "insurance unconfirmed."  *See State v. Daniel*, 446 S.W.3d 809, 811, 814 (Tex. App.—San Antonio 2014, no pet.).  The court of appeals relied on *Contraras* and *Gonzalez-Gilando*.  *See id.* at 815.  The record contained no additional evidence concerning the reliability of the FRVP or the officers' experience with it.  *See id.* at 813–15.

---

[2] A driver must establish financial responsibility to operate a motor vehicle, and having compliant insurance is one method of satisfying the statute.  *See* Tex. Transp. Code §§ 601.051, 601.191.

At least one other Texas court of appeals has addressed the issue of a "no record" return concerning a vehicle's registration. The Ninth Court of Appeals reversed the trial court's orders of suppression in two related cases, holding that an officer had reasonable suspicion that "there may have been some problem with the registration of the vehicle." *State v. Como*, 821 S.W.2d 742, 745 (Tex. App.—Beaumont 1992, pet. ref'd); *State v. Hammitt*, 825 S.W.2d 131, 134 (Tex. App.—Beaumont 1992, pet. ref'd). The officer had radioed the license plate number and received a "no record" response, which meant that either the vehicle was unregistered, newly registered, or had an altered license plate. *Como*, 821 S.W.2d at 743; *Hammitt*, 825 S.W.2d at 132.

In this case, the officer testified about his extensive use of the databases and that, in his experience, the databases were reliable. There had been "very few" times that the databases would show that a vehicle was unregistered when the vehicle in fact was registered. He was aware that the databases were managed by the Texas Department of Public Safety and that both unregistered vehicles and newly registered vehicles might result in a "no record" return. This evidence, showing the reliability of the databases and the officer's experience with them, differentiates this case from *Contraras*, *Gonzalez-Gilando*, and *Daniel*. *Cf. Ellis v. State*, 535 S.W.3d 209, 215–17 (Tex. App.—Fort Worth 2017, pet. ref'd) (distinguishing these cases and affirming the trial court's denial of a motion to suppress when the stop was based on the computer database indicating "unconfirmed" insurance status; relying on the officer's testimony that he had used the database many times, that only a "handful" of the hundreds or thousands of returns of "unconfirmed" were erroneous, and that the database was "'very' accurate based on his experience").

Appellant also discusses an opinion by then-Circuit Judge Gorsuch from the United States Court of Appeals for the Tenth Circuit. *See United States v. Esquivel-Rios*, 725 F.3d 1231 (10th Cir. 2013). The court remanded to the trial court for additional evidence concerning the database's having "no return" for registration status because other evidence undermined the reliability of the database. *See id.* at 1238–39. There was evidence that out-of-state temporary tags like the defendant's "usually don't return" in the computer database, but the record failed to show why they don't return or if there was other indicia of reliability for the database; not even the name of the database was in the record. *See id.* at 1335–36. The court contrasted the unique facts of the case with others upholding an officer's reliance on computer databases: "This court and others have regularly upheld traffic stops based on information that the defendant's vehicle's registration failed to appear in a law enforcement database—at least when the record suggested no reason to worry about the database's reliability." *Id.* at 1235.

There is no such affirmative evidence in this case to undermine the reliability of the TCIC, NCIC, or TLETS databases. And, as noted above, the officer testified about his familiarity with the databases and the likelihood that "no record" meant something other than unregistered.

The dissent relies on *Duckett v. United States*, a case similar to *Esquivel-Rios* because it involved affirmative evidence undermining the officer's reliance on the database. *See Duckett v. United State*, 886 A.2d 548, 550–51 (D.C. 2005). The officer in *Duckett* stopped a vehicle based on a "blank" result when querying the defendant's license plate number in a local database. *Id.* at 549–50. A sergeant testified that a "blank" result in the database was caused by "one of two main reasons: either the DMV has not yet updated [the database] with the registration information for the vehicle, *i.e.*, the vehicle was registered and issued a license

8

plate after the last weekly update; or a clerical or computer error of some kind has interfered with the DMV's download of the information." *Id.* at 550. Although it was "possible" that a "blank" result meant the vehicle was unregistered, that possibility was "very unlikely in a case, such as this one, involving a metal license plate." *Id.* at 550–51. The court of appeals relied on the "uncontested" testimony from the sergeant, reasoning that the likelihood of the vehicle being unregistered was "too remote a possibility, especially compared to the two most likely and innocuous reasons for the blank screen response, to have justified the inference of non-registration that [the officer] drew." *Id.* at 551. The court held that the motion to suppress should have been granted. *Id.* at 553.

In this case, the officer acknowledged the possibility that a "no record" return meant the vehicle had been registered "fairly soon." But in his experience, there had been "very few" occasions that a vehicle actually had been registered. Nothing in the record indicates that a new registration is the "main reason" the database would show a "no record" entry. Nothing in the record indicates that the officer's conclusion was "very unlikely" or a "remote" possibility. Thus, nothing in the record undermines the officer's uncontested testimony that the "no record" return indicated to the officer that appellant's vehicle was unregistered.

The possibility of an innocent explanation for the "no record" return (e.g., that the truck was newly registered) did not prevent the officer from reasonably suspecting that the vehicle was unregistered based on the "no record" return. *See Hammitt*, 825 S.W.2d at 134; *see also Leming*, 493 S.W.3d at 562, 565. The officer justifiably stopped appellant to resolve the ambiguity. *See Leming*, 493 S.W.3d at 565; *see also Ellis*, 535 S.W.3d at 215–17.

Appellant's first issue is overruled.

9

## III. DETENTION

In his second issue, appellant contends that the subsequent detention was illegal because the officer "did not in good faith investigate the purported reason for the traffic stop." He contends that the five-minute detention was unreasonable because the purpose of the stop was to investigate a potentially unregistered vehicle, but the officer frisked appellant and questioned him about other matters before obtaining consent to search the truck.

### A. Evidence About the Detention

The officer testified that he was a K-9 handler for the Rosenberg Police Department and part of the Fort Bend County Narcotics Task Force. He was assigned to intercept narcotics and proceeds of narcotic sales along the major thoroughfares in Fort Bend County. He stopped appellant's "utility work truck"—a type of vehicle with which the officer was familiar based on prior traffic stops. When he approached the truck on foot, he noticed an atypical "large separation" between the tailgate and bumper. Also, the bed of the truck was a little bit higher than the bottom of the tailgate. These facts led the officer to believe that there could be a hidden compartment in the truck. As part of his training for narcotic interdiction, he had had received "compartment" training. He also noticed that the truck appeared clean and had no tools in it.

When the officer asked for appellant's license and proof of insurance, appellant gave the officer a Texas identification card and said that he did not have a driver's license. The officer noticed that there was no luggage or other "personal items" in the truck, such as "C.E.s [sic], receipts, trash, cigarettes, . . . paperwork in the glove box," or the like. In the officer's experience, the lack of personal items was consistent with drug trafficking.

10

The officer told appellant about the reason for the stop, and appellant said the truck belonged to his brother-in-law. The officer asked appellant to get out of the truck and sit in the passenger seat of the patrol car, and appellant complied. The officer briefly frisked appellant for weapons before appellant got in the car. The officer testified that it was his "standard procedure" for traffic stops to put people in the patrol car for his safety, the other person's safety, and to make the traffic stop go quicker. He explained that with the other person in the patrol car, he could ask questions without having to go back and forth from one vehicle to another while checking things on his computer.

While the officer was verifying appellant's information through the computer, the officer asked appellant some questions. Appellant repeated that he did not have a driver's license, and the officer was unable to confirm if appellant had a license. The officer questioned appellant about his travel plans—where he was going, from where he was coming, whom he was going to visit, and the like— and whether there was anything illegal in the truck. Appellant said he was making a one-day trip to visit a cousin in Houston, and there was nothing illegal in the truck. The officer noticed that appellant seemed nervous because appellant was fidgeting with his hands and avoiding eye contact. During the questioning, the officer recognized appellant from a prior traffic stop, which had resulted in the officer seizing over $250,000 in United States currency from the car.

Within five minutes of the officer having approached appellant at the truck, the officer asked if he could search the truck. Appellant consented. Ultimately, officers found a compartment containing more than ninety-five pounds of cocaine. The events of the traffic stop were recorded on the patrol car's dashcam, and the video was admitted as an exhibit.

11

## B.    Analysis of the Detention

Appellant "concedes that [the officer] was duty-bound to perform the functions" described in *Kothe v. State*, which include (1) requesting the driver's license, registration, and insurance, (2) using that information to conduct a computer check for outstanding warrants; and (3) questioning the driver regarding travel plans. *See* 152 S.W.3d 54, 63–64 & n.36 (Tex. Crim. App. 2004); *see also Vasquez v. State*, 324 S.W.3d 912, 920 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd)).  Appellant contends that the officer "performed these functions in a manner expressly designed to delay the stop" and that the officer questioned appellant "about matters unrelated to the traffic stop delaying the computer check and eventual termination of the encounter."

However, the trial court's contrary conclusion is supported by the record. The officer testified that he questioned appellant in the patrol car "[w]hile running the information" in his computer.  Thus, the record does not support appellant's contention that the officer's questions prolonged the stop beyond the time reasonably required to complete the mission of the stop.  *See Rodriguez*, 575 U.S. at 354–55; *see also Lerma*, 543 S.W.3d at 190–91 (noting that there is no per se rule that an officer must immediately conduct a computer check on the driver's information before questioning the occupants of the vehicle about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop).  The officer testified that he questions motorists in his patrol car, near his computer, so he does not have to go "back and forth from the car," which would "hinder any time of the traffic stop."  The officer intended to "make[] the traffic stop quicker."  Indeed, appellant consented to the search of the truck within five minutes of the initial stop—a relatively brief

12

encounter. *Cf. Thompson v. State*, 408 S.W.3d 614, 623 (Tex. App.—Austin 2013, no pet.) (reasoning that the officer "conducted his investigation pertaining to the traffic stop in a diligent and expeditious manner, verifying after only five minutes that appellant had a valid driver's license and a clean record with no warrants").

The officer developed probable cause to arrest appellant almost immediately after the stop began because appellant did not possess a driver's license. *See* Tex. Transp. Code § 521.025 (person operating a motor vehicle must possess the license and display the license on demand of a peace officer, and a violation of this section is a misdemeanor offense); *State v. Gray*, 158 S.W.3d 465, 469 (Tex. Crim. App. 2005) ("Such an arrest for a minor traffic offense is not an unreasonable seizure under the Fourth Amendment."); *Snyder v. State*, 629 S.W.2d 930, 934 (Tex. Crim. App. 1982) (citing predecessor statute, "the officer had probable cause to arrest appellant due to his failure to produce a valid driver's license"); *see also Dew v. State*, 214 S.W.3d 459, 462 (Tex. App.—Eastland 2005, no pet.). Appellant contends that the record does not show that appellant "was not legally licensed to drive, which would have been a violation of the law," but rather, the record shows that appellant "did not have a driver's license in his possession." His distinction is irrelevant because the failure to *possess* the license while driving is an offense. *See, e.g.*, Tex. Transp. Code § 521.025. Appellant also challenges the trial court's finding that appellant's license was suspended, but this finding is unnecessary to determine whether the officer had probable cause to arrest appellant. The officer had probable cause to arrest appellant for the failure to possess a license. *See, e.g.*, *Snyder*, 629 S.W.2d at 934. Because the officer had probable cause for an arrest, he also had reasonable suspicion for a detention. *See Rubeck v. State*, 61 S.W.3d 741, 745 (Tex. App.—Fort Worth 2001, no pet.).

13

Appellant challenges the officer's credibility, referring to alleged conflicts between a dashcam recording and the officer's testimony, and to similarities between the officer's affidavits from other cases and the offense report in this case. But the trial court explicitly found the officer credible, and we must defer to that finding. *See, e.g.*, *Lerma*, 543 S.W.3d at 190 ("At a motion to suppress hearing, the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony."). None of the alleged conflicts undermine the trial court's ultimate conclusion that the detention was valid under the Fourth Amendment.[3] The offense report was not admitted as evidence, and appellant does not assign any error on appeal based on the trial court's exclusion of the report from evidence.

Appellant correctly notes that an officer may not frisk and place drivers in a patrol car simply as a matter of "routine" or "standard procedure," as the officer in this case testified. *See O'Hara v. State*, 27 S.W.3d 548, 553–54 (Tex. Crim. App. 2000) (holding "unequivocally that routine alone is insufficient to justify a pat-down" search; rejecting the State's argument that "once an officer has ordered a person out of his car, the officer could always, as a matter of routine, order the person to sit in the patrol car, and then always, as a matter of routine, frisk for weapons before allowing the suspect into the car"). But not every frisk conducted as a matter of routine will be overturned. *Id.* at 554. Sometimes, even when an officer erroneously conducts a frisk as a matter of routine, the objective facts will nevertheless justify the frisk. *Id.* We must look at all the facts surrounding the

---

[3] For example, appellant contends that the dashcam recording includes a dispatcher referring to "new local return, new state return" regarding registration of the vehicle. There is no context provided during the recording itself or in the testimony as to what this "local return, state return" means. Nor is it even clear that the dispatcher (or digital voice) is saying "new" rather than "no." Regardless, none of the alleged conflicts cast doubt on the detention because, as noted above, the officer had probable cause to detain and arrest appellant.

14

frisk to determine if a reasonable person in the officer's position would have been justified in frisking appellant. *See id.*

Because the officer had probable cause to arrest appellant for failing to possess a driver's license, the officer could search appellant incident to an arrest. *See Williams v. State*, 726 S.W.2d 99, 100–01 (Tex. Crim. App. 1986) (upholding search incident to arrest because the officer had probable cause to arrest for a parking violation; fact that the officer "was investigating what he took to be a narcotics transaction is of no moment in this case" because the officer's failure to have "the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action" (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978))). It is not dispositive that the officer testified he searched appellant as part of his "standard procedure" and that appellant was not under formal arrest. *See O'Hara*, 27 S.W.3d at 553–54; *see also State v. Sanchez*, 538 S.W.3d 545, 550 (Tex. Crim. App. 2017) ("The formalities associated with arrest do not seem to matter to the Supreme Court in the search-incident-to-arrest context as long as the arrest was close in time to the search and the requisite probable cause to arrest (that justifies the arrest and search) arose before the search.").[4]

---

[4] Even if the frisk were illegal, the inquiry would not end. An illegal search or seizure does not automatically invalidate consent that has been freely and voluntarily given. *See Juarez v. State*, 758 S.W.2d 772, 779 (Tex. Crim. App. 1988), *overruled on other grounds by Boyle v. State*, 820 S.W.2d 122, 132 n.10 (Tex. Crim. App. 1989). Appellant does not mention the factors discussed in *Brick v. State* for determining whether a defendant's consent to search has been tainted by a prior illegal search or seizure. *See* 738 S.W.2d 676, 678–81 (Tex. Crim. App. 1987). Nor does appellant provide any other framework for analyzing how the brief frisk of a person, which revealed no contraband or incriminating evidence, might taint a subsequent voluntary consent to search a vehicle and thus require suppression of contraband found in the vehicle as fruit of the poisonous tree. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 488

Moreover, we conclude that the officer developed additional reasonable suspicion of narcotics trafficking during the traffic stop, and therefore, justifiably prolonged the stop to briefly investigate and question appellant. The officer knew that (1) appellant was driving without a license; (2) the separation of the tailgate from the bumper and the height of the bed of the truck indicated the possibility of a hidden compartment; (3) the utility work truck was clean and missing tools; (4) personal effects were absent from the truck; (5) appellant appeared nervous by fidgeting with his hands and avoiding eye contact; and (6) the officer recalled appellant from a prior traffic stop that resulted in the seizure of over $250,000 in cash.

Although some of these facts, such as nervousness or the prior encounter between the officer and appellant, would not necessarily establish reasonable suspicion in isolation, the combined force of the facts known to the officer support the trial court's conclusion that the officer had reasonable suspicion to detain appellant for an investigation into possible narcotics trafficking. *See Hamal v. State*, 390 S.W.3d 302, 307–08 (Tex. Crim. App. 2012) (upholding trial court's denial of a motion to suppress when the officer prolonged a traffic stop to wait for a drug-dog; reasonable suspicion established because the defendant was speeding at night, had multiple prior drug arrests including one seven months prior, told the officer she had never been in trouble before, and appeared nervous with shaking hands); *Villarreal v. State*, 565 S.W.3d 919, 923, 928 (Tex. App.—Corpus Christi 2018, pet. ref'd) (upholding trial court's denial of a motion to suppress when the officer continued detaining the driver to investigate drug trafficking; reasonable suspicion established because there was a report that a matching truck had been flagged at a border patrol for possible involvement in trafficking, appellant gave a

(1963) (addressing whether evidence was discovered "by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint").

16

seemingly rehearsed story and appeared unusually nervous, the driver was not carrying any cargo and was driving in the dead of night, and the smell of fresh paint indicated a possible hidden compartment); *see also United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006) (holding that a driver's consent to search a truck was not tainted by an unconstitutional detention because reasonable suspicion supported continued detention; reasonable suspicion established when the officer observed scratch marks and adhesive around the gas tank because the discovery created a reasonable belief that the vehicle contained a hidden compartment; "evidence indicating the existence of a hidden compartment also supports the lesser standard of 'reasonable suspicion'"); *cf. United States v. Inocencio*, 40 F.3d 716, 723–24 (5th Cir. 1994) (upholding search of truck based on driver's consent and probable cause in part because the driver appeared nervous and gave conflicting statements, and the bed of the truck was higher than normal and had fresh paint, which contributed to a reasonable belief that the truck contained a false compartment).

Appellant's second issue is overruled.

## IV. CONCLUSION

Having overruled both of appellant's issue, we affirm the trial court's judgment.

/s/    Ken Wise
        Justice

Panel consists of Chief Justice Frost and Justices Wise and Hassan. (Hassan, J., dissenting).
Publish — Tex. R. App. P. 47.2(b).